Jerome A. Eisenlord

v.

The Oriental Insurance Company of Jersey City,
and others.

A stockholder who subscribes for his stock under an agreement with
the secretary of the company that the company will "redeem" his
stock at any time at par and ten per cent. interest, and for payment
assigns a mortgage with a collateral policy of insurance, payable, in
case of loss, to the company, cannot, after loss and payment to them,
and the insolvency of the company, recover the amount from the
insolvent company, as against *bona fide* stockholders and creditors ; it
appearing that the object of the transaction was to give the company
credit before the public.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. J. F. Randolph,* for complainant.

*Messrs. Williams & Cowles,* for the defendant, the receiver.

The Chancellor.

The complainant is one of the stockholders of the Oriental
Insurance Company of Jersey City, an insolvent corpora-
tion, and this suit is brought against the company, Alexan-
der II. Laidlaw, the late president thereof, and Robert
Wilson, late secretary of the company, William Gray and
the receiver appointed by this court for the creditors and
stockholders, on proceedings in insolvency under the statute,
and others. Its object is to obtain the insurance-money paid
for loss by fire under a policy held by the company at the
time of its failure as collateral security for the payment of a
mortgage of $1,300, assigned by the complainant to them for
the price of thirteen shares of the capital stock subscribed
for and taken by him, and which he still holds. The ground
of relief is, that the complainant was induced to purchase

the stock through fraudulent representations made to him by Wilson and Gray.

The evidence shows that the company was organized on the 17th of March, 1874, and was, from the beginning, a flagrantly fraudulent concern. It appears by the complainant's testimony that on the 14th of April following he subscribed for and took three shares of the stock; that on the 2d of May following he subscribed for and took ten; on the 21st of that month, thirteen, and, subsequently, about the 1st of June following, fifty-two shares. For the stock which he so bought he paid as follows : For the shares purchased on the 14th of April, he assigned to the company a mortgage given by one McHugh; for six of the shares bought on the 2d of May, he assigned to it a mortgage given by one McDermott; for the rest of the stock bought on that day he assigned to it a mortgage given by one Becker, and for the thirteen shares bought on the 21st of May, he assigned to it a mortgage given to him by Gray for $1,300, on a house and lot, which, at the time of the transaction, were owned by the complainant, but which he then conveyed to Gray for the pretended consideration of $2,200, though there was, in fact, no consideration at all; but the conveyance was made to Gray merely in order that he might give to the complainant the mortgage upon the property, so that the latter might assign it to the company for the price of the stock. The policy of insurance upon the house was, at the same time, assigned by the complainant to Gray, as owner, the loss, if any, payable to the company as collateral security for the mortgage debt. The property was subsequently reconveyed to the complainant. For the fifty-two shares purchased about the 1st of June, he assigned to the company a mortgage of $2,200, which he held on land in Bergen county, and gave the company a mortgage for $3,000 on the house and lot where he lived. He testifies that he entered into all these transactions, made all these purchases of stock, under and in pursuance of an agreement made by Wilson with him to take the shares from him at

par and interest at the rate of ten per cent. per annum on the par value, from the time of the purchase, or obtain a purchaser for them for him at that price—par and ten per cent. interest. For the difference between the McHugh, Becker and McDermott mortgages (the Becker mortgage appears to have been worthless), with interest thereon, and the price of the stock, the complainant received cash from the company.

The agreement as to the six shares purchased with the McDermott mortgage was, that the company would purchase them from the complainant when the mortgage should become payable, and would pay him ten per cent. interest on the price he had paid for them, from the time of his purchase. Accordingly, it "redeemed" them, as he terms it, from him, in October, 1874, and paid him for them the price, with interest, as agreed upon.

A somewhat similar agreement was made as to the mortgages which were given for the fifty-two shares. He says that they proposed to hold them only three or four weeks. The company held them, in fact, until some time in October, 1874, when they were exchanged with him for the stock. That agreement was in writing. It is dated June 24th, 1874, and was signed by Wilson. By it he agreed to redeem the stock held by the complainant to the amount of $5,200, on demand, by giving him the mortgages, with interest thereon from their date. The company was, in fact, to return to him the mortgages and take back the stock whenever he should ask it. He himself says it was merely a "temporary transaction." There appears to be no room to doubt that that transaction was fraudulent; that it was intended to enable the company, in making the annual statement required of it by law, fraudulently to report the mortgages as part of its assets. The statement was sworn to on the 8th of October, 1874, and was filed on the 17th of that month. In it the mortgages appear among the assets, and, according to his own testimony, he received them again in exchange for the stock in that month. Mr. Gray,

who was merely a clerk in the office of the company, testifies that, in July, 1874, the complainant, at the company's office, asked him if the secretary of state had made his examination of the assets of the company; that this was before any examination had been made; that the witness told him that no examination had been made, but that one was daily expected; that the complainant then told him that he had loaned two mortgages to Wilson, one for $3,000 and the other for $2,200; that the complainant told him that they were to be used as assets of the company, to pass the examination of the secretary of state, and that he had lent them for about three months, the time expiring about July, and that at the expiration of the three months Wilson was either to pay him in cash or return the mortgages, and that the complainant said that some portion of the mortgages was the property of his dead brother, and that he was a little particular about them on that account. He says he had another conversation with the complainant on the subject, at the company's office, in August following; that in that conversation the complainant " went over pretty much the same language"—said he had loaned his mortgages to the company, and asked the witness if the secretary of state had made his examination yet; that the witness told him he had not, and the complainant then spoke about the mortgages as before, and showed Gray a paper written by Wilson; that when the complainant first spoke to him on the subject the witness told him he had better see Wilson, and, he adds, that the complainant said he wanted to get the mortgages or the money, as Wilson had promised him. He says he had a third conversation with the complainant on the subject, in August or September; that the complainant again asked him whether the secretary of state had made the examination, and that the witness told him that he had not, but that they were expecting him daily. Gray says the examination by the secretary of state was made in October, and that after that the complainant again demanded the mortgages, and the president of the company

gave them to him.   He swears that in each of those conversations with him the complainant stated to him that the mortgages were loaned to enable the company to pass the examination by the secretary of state.   The complainant, indeed, denies that he told Gray that he had loaned the mortgages to Wilson to be used as assets of the company, to enable it to pass the examination; and he denies that he told him that he had loaned them for about three months, and that at the expiration of the three months Wilson was to pay him in cash or return the mortgages.   He denies, also, that he ever lent the mortgages to Wilson to be used as assets of the company in passing the examination.   He had previously, however, in his testimony, admitted that he told Gray, in the conversation to which the latter testifies, that he had furnished the mortgages to be used in the assets of the company, and that he told him that Wilson was to have them three or four weeks, and then return them to him, and that they " were only temporary, and that they should be returned."   To the question whether he did not tell Gray that the mortgages were to be returned to him as soon as the examination should have been made, he had previously replied that he remembered nothing of that kind; and to the question whether he did not tell Gray that he was particular about those mortgages because they were the property of his brother's estate, but, as to the other mortgages, he would let them take their chances, he had previously answered, qualifiedly, that he did not think he did.

But the testimony of Gray is strongly corroborated by the certificate before referred to, and the circumstances of the case.   The certificate provides for a return of the mortgages themselves, not in three months, but on demand, and the fact is, that the mortgages were left in the hands of the company, to figure as assets until after the examination was made, and then they were returned to the complainant.

But, further, the complainant seems unwilling to explain his transactions with the company fully.   He received from

29

them $206, in April, 1874, and he gives no satisfactory account of it. He merely says " it was a business transaction, and had nothing to do with this case,—that is, to the best of ' his ' knowledge." But it does not appear that he had any other business with the company than these transactions in which he exchanged his mortgages for its stock.

There is great reason to believe that he was aware of the character of the company, and was a willing party, in consideration of compensation to be paid to him by them, to their fraudulent contrivances to deceive. He must have known that such transactions as those in which he engaged, and by which he became the apparent owner of stock in the company, temporarily, merely, were designed to defraud by inducing confidence in the company, based on his alleged ownership of its stock, and of its possession of the securities which he transferred to them.

In the transaction under consideration, he became the owner of thirteen shares of the stock, for which he gave the mortgage of $1,300. The transaction by which that mortgage was created, the conveyance to Gray, by which he was made to appear to be the owner of the complainant's property, at the price of $2,200, and the complainant a mortgagee thereof, shows complicity on his part with Wilson. He has no title to relief as against the creditors and *bona fide* stockholders of the corporation

The bill will be dismissed, with costs.